WILLIAM GOODENOW, Adm'r. *versus* SALLY DUNN, Adm'x.

Whenever it may be agreed between several parties to do and perform reciprocal acts for each other, the performance of one part being the consideration for the 'performance on the other; and that the agreement shall be evidenced by writing, under the hands and seals of the parties, until so executed by all the parties it cannot be obligatory upon either of them.

Where a cause of action has accrued to a party who has signed such agreement, independent of the agreement, against a party who has not signed, and he has taken measures to enforce his claim, it is too late to alter the state of the case, and prevent a recovery, by thereafter affixing to the instrument the signature and seal of the party who has not previously signed, without the knowledge or consent of the party seeking his remedy.

Prior to the late statutes concerning registration thereof, mortgages of moveables were inoperative against attaching creditors, unless accompanied by a delivery of the property mortgaged, either actually or symbolically.

Ships and goods at sea have, sometimes, been considered as exceptions to the general rule ; in regard to which the delivery of the muniments of title are allowed to be sufficient till actual possession can be taken; which must be done when it becomes practicable, or the conveyance will be void against creditors.

The mortgage of a ship, on the stocks, raised and building, to be built and completed afterwards, as security for advances made and to be made, without actual possession or delivery, is not available, by way of hypothecation, against attaching creditors.

THIS action was originally commenced by Daniel Gilbert, since deceased, on whose estate W. Goodenow has been appointed administrator, against Josiah Dunn, formerly sheriff of the County of Cumberland, since deceased, on whose estate Sally Dunn is administratrix, for the default of Sewall Milliken, who had been his deputy. The attachment of the vessel, then unfinished, on Gilbert's writ against Waterhouse, the builder of the vessel, was made October 14, 1837, being the first attachment in the order of time ; the bill of sale of one fourth of the vessel from Waterhouse to Southgate was made July 13, 1836, to secure him for advances made and to be made in building her ; the bill of sale to Carter by Waterhouse of one half the vessel, to secure him also for advances made and to be made, was on May 27, 1836. No delivery of the vessel to Southgate or to Carter was made until October 17, 1837, after the attachment, when all the delivery was made, which was capa-

Goodenow v. Dunn.

ble of being made, while she was in the hands of the officer, without his consent. The vessel was built, so far as Waterhouse conducted the building, on the public landing in Scarborough, and she was there in an unfinished state at the time of the making of the bills of sale and at the time of the attachments of Gilbert and of others, but was afterwards, by an agreement of persons interested, moved round to Portland, and there finished and sold by Milliken. Fifteen other attachments of the vessel by Milliken were proved to have been made, and Gilbert, and all the others, claimed a lien on the vessel under the provisions of the statute. The jury found that Gilbert had no lien, but that the other fifteen had. Milliken had in his hands, after paying all expenses incurred by him in finishing the vessel, $8,705,60. The amount of the judgments of the fifteen creditors, entitled to a lien, was $4,005,00. Balance, 4,700,60. The material facts in the case are concisely stated in the opinion of the Court.

The verdict was for the plaintiff.

*W. Goodenow*, for the plaintiff.

There has nothing taken place to prevent maintaining the action against the sheriff for the default of Milliken, his deputy. The contract under which the vessel was finished and sold was never signed by Milliken until after our judgment was rendered, and a demand made on him for the property attached, and then without Gilbert's knowledge. Milliken was one of the four parties to that agreement, and unless all the *parties* sign, it is not binding on those who do sign.

Nor has there been any ratification. There can be no parol ratification of an instrument under seal. *Stetson* v. *Patten*, 2 Greenl. 359. But not even that has been proved.

But if the agreement had been executed by all the parties, still it would not have released Milliken in his official character, and of course the sheriff is bound. The sheriff has power to sell personal property attached by consent of creditor and debtor, and the sheriff is liable for the proceeds, when done by the deputy. *New Hampshire Savings Bank* v. *Varnum*, 1 Met. 34. By the terms of the agreement, the proceeds were

to be held in the same manner, as if the sale had been made on execution.

It can make no difference, whether the intestate was entitled to a lien or not. Our attachment was the first, and there is a balance in the hands of the officer of more than sufficient to pay our execution, after paying all expenses and all creditors entitled to a lien. We are then entitled to recover, unless the mortgages of Southgate and Carter are entitled to a priority over us.

Those bills of sale may be good, as between the parties to them; but they are void as to attaching creditors, because there was no delivery of the vessel. No possession was attempted to be taken, until after the vessel was attached, and in the custody of the law.

*F. O. J. Smith*, for the defendant.

The sheriff is not liable for the acts of Milliken. He did not act as a deputy, but the vessel was sold under an agreement, entered into not only by the creditor, debtor and officer, but two other parties, not standing in either of those relations, but as mortgagees. The whole parties to the agreement covenanted to do certain things between themselves, and that Milliken should be the agent to carry the agreement into execution. He accepted, and went on and acted; and it is wholly immaterial whether he signed or not. He acted under the agreement, and sold under the agreement, and is bound to pay over under the agreement, and in no other manner.

But were it otherwise, his signature related back to the time of the execution of it by the others and is a ratification of it under seal. In the case cited for the plaintiff, the ratification was merely by parol. Besides, the mere sale by his authority, and the receipt of the money, under the agreement, estop him to deny, that he had acted under it.

Being a binding agreement, the terms as well as the spirit of it take the property out of the hands of Milliken as an officer, and place it in them as agent and trustee. As an officer, he could not pay to the mortgagees, and yet the plaintiff, by becoming a party to the agreement, agreed that this

should be done. He is an officer as to the whole of the parties or none.

Again the putting of Milliken's own property into the vessel, and finishing it off, and mixing up the property attached with his own, dissolves the attachment. If the property had been again attached, Milliken could only have held under his agreement, and not under his attachment. *Gordon* v. *Jenney*, 16 Mass. R. 465.

The sheriff is not responsible, unless the deputy acts as an officer. *Marshall* v. *Hosmer*, 4 Mass. R. 60 ; *Bond* v. *Ward*, 7 Mass. R. 123 ; *New Hampshire Savings Bank* v. *Varnum*, 1 Metc. 34.

There seems to have been an argument furnished in behalf of the mortgagees ; but when, or by whom, or what *it was*, further than appears in the opinion of the Court, is unknown to the Reporter.

The opinion of the Court was drawn up by

WHITMAN C. J. — This action was commenced against the defendant's testator, as sheriff of the County of Cumberland, for an alleged misfeasance of his deputy, Sewall Milliken. It appears that Milliken, on the fourteenth day of Oct. 1837, received a writ of attachment in favor of the plaintiff's intestate, and against John Waterhouse ; by virtue of which he made an attachment of a certain vessel, then on the stocks, which Waterhouse had built ; afterwards called the barque Horace, as his property ; that the plaintiff's intestate afterwards, on the 30th day of Jan. 1841, recovered judgment in the same suit, against said Waterhouse for the sum of $1856,03 debt ; and $37,36 costs of suit : and on the first of Feb. 1841, obtained an execution thereon ; and put it into the hands of a deputy of the then sheriff of the county (the defendant's intestate not being then sheriff ;) who, in due season, demanded of said Milliken, he not being a deputy of the then sheriff of the county, the vessel, or the proceeds of the sales of her, with which to satisfy said execution ; which Milliken refused to surrender. Upon this evidence, and evi-

dence tending to prove a lien, under the statute of 1834, c. 104, § 1, the plaintiff's intestate contended he had a right to recover.

The defendant's intestate, thereupon, offered in evidence a certain contract, bearing date Nov. 21, 1837, under the hands and seals of the plaintiff's intestate, and of said Milliken and Waterhouse, and certain other attaching creditors, and mortgagees of portions of said vessel, in which it was agreed, that Milliken should have power, as well by the consent of the parties, as by virtue of *the power in him vested as attaching officer*, to make sale of said vessel for cash, either at private or public sale, as he might judge most for the interest of all concerned; and from the proceeds, that he should reserve and take to himself the amount of his fees, together with his disbursements for the insurance of said vessel, and all other expenses, which he might incur under said contract; and that the balance thereafter remaining, should be deposited in some safe bank, where it was to remain to abide the appropriation of law; according to the several and respective rights of the said mortgagees and attaching creditors, in the same way and manner, and to the same extent, and in the same proportion, that the attaching creditors and mortgagees would be entitled to, had said vessel been retained by said Milliken to satisfy the judgments, which the attaching creditors, respectively, might recover of said Waterhouse; and the said mortgagees, attaching creditors and Waterhouse further covenanted and agreed, in said writing, with the said Milliken, that he might sell and convey said vessel, as she then lay at the wharf in Portland; or might sell her, contracting to finish her, as he on advice, might judge to be most for the interest of all concerned; and as he could agree with the purchaser thereof; the said Waterhouse covenanting, at the same time, to furnish the requisite certificate to obtain a register for said vessel; and the said Milliken covenanting to make sale of said vessel, and apply the proceeds in manner aforesaid. To the introduction of this writing the plaintiff's intestate objected, alleging that it had not been duly and seasonably executed by the said Mil-

liken. And it appeared that said Milliken did not subscribe and affix his seal thereto, until after the demand made upon him, as before stated; nor until long after the sale of said vessel, and the receipt, by him, of the proceeds thereof, viz. not until the 21st of May, 1841; and then, without the knowledge and consent of the plaintiff's intestate. The writing, however, was permitted to be read in evidence; and it appeared, that Milliken had in all respects conformed to the terms of it, by making sale of the vessel, and depositing the nett proceeds in a safe bank; and without objection made by any one of the concerned.

It is now contended, on the part of the defendant, that, by reason of said contract, the sheriff was exonerated from liability, on account of any act, on the part of said Milliken, in reference to the sale and disposition of the proceeds of said vessel, and not accounting therefor; and that the remedy of the plaintiff's intestate, if any he had, was against Milliken as an agent or trustee. And if we could regard the writing as having been duly and seasonably executed by the said Milliken, it may be, that we should come to that conclusion. Whenever it may be agreed between several parties to do and perform reciprocal acts for each other, the performance of one part being the consideration for the performance on the other; and that the agreement shall be evidenced by writing, under the hands and seals of the parties, until so executed by all the parties it cannot be obligatory upon either of them. In this case it was the intention to intrust Milliken with extensive powers, in contemplation of his becoming bound to be responsible to the plaintiff's intestate and to the others, to be faithful to his trust. Whether by oversight or design it does not appear, he did not so become bound, without which the contract could not become obligatory on either side. The consequence was, that, when the plaintiff's intestate became entitled to demand his share of the proceeds of the sale of the vessel, in case the contract had been obligatory upon Milliken, by reason of its not being executed by him, he had no remedy under it; and was compelled to take measures to enforce his claim

simply as an attaching creditor. And, having done so, it was too late to alter the state of the case by thereafter affixing the signature and seal of Milliken, without the knowledge or consent of the plaintiff's intestate. The obligatory effect of instruments takes place from the moment of their execution, and not before; and if not executed, when it was intended they should be, they cannot be effectually executed afterwards, unless by consent of parties. In this case the contract was prepared to be signed; and was signed by all the parties, except Milliken, in Nov. 1837; but not by him till in May, 1841; after the rights of the plaintiff's intestate had become fixed against the defendant's intestate. It must therefore be laid out of the case.

But, as it respects the condition of Milliken, who is responsible to the defendant as administratrix, it is not, perhaps, upon the view, which we have taken of the case, material, whether the contract is considered as in force or not. If the attachment takes precedence of the mortgages of Carter and Southgate, Milliken would be equally responsible either to the plaintiff's intestate, under the contract, or to the defendant's intestate, in case he should be considered as having been liable on account of the malfeasance of his deputy, who is responsible over, for any amount, which may be recovered in this case. The mortgages being out of the way, it will be immaterial to the plaintiff, whether he has a lien under the statute or not; the property attached being amply sufficient to answer the purposes of the attachments, and all statute liens.

It appears that neither of the mortgages had, prior to the attachments, been accompanied by a delivery of possession of the property mortgaged. It is no doubt true, that mortgages are good as between the parties, without a delivery of possession, and perhaps also against trespassers without color of right. But, until the passage of some late statutes, concerning registration, mortgages of moveables, it is believed, have uniformly been held inoperative against attaching creditors; unless accompanied by a delivery of the property mortgaged, either actually or symbolically. Mr. Chancellor Kent, in his com-

mentaries, says, "The pledge of moveables, without delivery, is void as against subsequent *bona fide* purchasers, and generally as against creditors." Vol. 2. p, 581 of 3d ed. Mr. Justice Putnam, in *Parsons* v. *Dickinson*, 11 Pick. 352, says, "If this should be considered a question between a *bona fide* purchaser, and an attaching creditor, it would be clear for the latter; for the creditor attached the goods before the vendee had perfected his title by having an actual delivery of them (the goods sold) to him." And the opinion of the court is equally explicit to the same effect, in *Lanfear* v. *Sumner*, 17 Mass. R. 110; and the principle is recognized in numerous other cases. Ships and goods at sea have, sometimes, been considered as exceptions to the general rule; in regard to which the delivery of the muniments of title are allowed to be sufficient till actual possession can be taken; which must be done when it becomes practicable; or the conveyance will be void against creditors.

In the case at bar the vessel purporting to be mortgaged, was not, as such, at the time actually in being. Carter's mortgage describes it thus; " one half of a ship now on the stocks, raised and building; to be built and completed during the coming season." And Southgate's is of one quarter part of the frame or hull of a ship, which Waterhouse was then building, calculated to be, when finished and launched, about four hundred and fifteen tons. The construction of the vessel was going forward in the shipyard used for the purpose by the mortgagor; and the mortgagees resided in the vicinity, yet no act of possession, under either of the mortgages, before the attachment relied upon in this case, ever took place.

But it is urged that the mortgages amounted to an hypothecation; and, according to the rules of the civil law, were effectual to transfer the property, without a delivery; and that, by the civil law, things, not in being, might be hypothecated; and, as they came into being, the hypothecation would attach upon them. This, as a general principle in the civil law, may be true; yet in countries where that law now prevails it may be questionable whether any such conveyance would be held to

be good against *bona fide* purchasers; and attaching creditors are deemed to be under our law in an equally meritorious predicament. But, be the rule of the civil law what it may, if not in accordance with the common law, it cannot have force here. We have adopted the common law; and must be governed by its principles. The Legislature alone can absolve us from this obligation. The civil law may be, and often is resorted to by way of elucidation, in doubtful cases, and in cases of a novel character; and especially in equity and admiralty proceedings; but the common law, when clearly furnishing the rule of action, whether in conformity to the civil law or not, must, among us, be solely regarded. In Story on Bailments, § 298, it is said, "In none of these States (of modern Europe) is the hypothecation of moveables allowed to prevail, as it did at Rome, against a subsequent *bona fide* purchaser; and, in many of these states, it is void even against personal creditors." And that "this is true in respect to the laws of Scotland, and the law of France; which agree with the *common law of England* in making void all hypothecations of moveables, without a delivery, *so far as regards creditors*," in support of which he cites 2 Bell's Com. § 702, 703, and 707. The opinion of Mr. Justice Burnet, in. *Ryall* v. *Rolle*, 2 Atkins, 165, is, as to the common law, to the same effect.

In *Macomber* v. *Parker*, 14 Pick. 497, Mr. Justice Putnam, in delivering the opinion of the court, is reported to have held the following language. "It was an agreement for the pledging of the bricks as they should be made. It is true that, where the property is to be thereafter acquired, it is not strictly and technically a pledge; it is rather an hypothecation; but, when the title is acquired *in futuro*, the right of the pledge attaches immediately upon it," and cites Story on Bailments, § 200 and 294. The last section cited is as follows; "In our law a pledge is strictly confined to property of which there may be a present possession or title; or in which there is a present vested right or interest. But although, by the common law, there cannot be a technical pledge of property, not then in existence, or to be acquired *in futuro*; yet there may be a

contract for an hypothecation thereof; and when the title is acquired, or the property comes into existence, the right of the pledge will immediately attach to it." In his last edition, Judge Story cites, at the close of the above section, the case of *Macomber* v. *Parker*, as in confirmation of the position; but remarks, that it is not easily reconcilable with *Bonsey* v. *Amee*, which will be presently noticed. It may be observed, that Mr. Justice Putnam does not explicitly say, that an hypothecation, whether of property in being or to be acquired or created, without an actual delivery or possession, would be good against *bona fide* attaching creditors; nor does the work on bailments make any such assertion. If they had done so it would have been manifestly opposed to the passage first cited, from Story on Bailments, and to the opinion, before cited, of the court, delivered by Mr. Justice Putnam in *Parsons* v. *Dickinson;* and to all the common law authorities. Yet it must be conceded, that the passage above cited from the opinion, in *Macomber* v. *Parker*, might lead to the apprehension, that the contrary was in the contemplation of the learned Judge. Beginning as he did by saying " this was an agreement pledging the bricks as they should be made," would seem to imply that this position was laid down as applicable to the case before him; and as tending to show, that, without actual possession obtained, such an hypothecation was good against attaching creditors. And in this view, the case of *Macomber* v. *Parker*, would be utterly irreconcilable with the case of *Bonsey* v. *Amee*. But the case then before the court did not call for any such decision. The remarks of the learned Judge were wholly unnecessary (unless by way of elucidation) to the result to which the facts in that case, rendered it indispensable that he should come. He says himself, in that case, " that from the time Evans (the debtor) was discharged, until the attachment, the plaintiffs had the actual care and charge of the brick yard, bricks attached and property, *by themselves or their new agent, Hunting.*" And in the conclusion, and summing up of the grounds upon which the opinion is based, no allusion is to be found to an hypothecatory right. Viewing the decision, which actually

took place in that case, in this light, the discrepancies between it and the case of *Bonsey* v. *Amee,* will in a good measure, if not entirely disappear.

But with great deference towards, and profound respect for the learned Judge, who pronounced the elaborate opinion, in the case of *Macomber* v. *Parker,* it does seem to me, that the ground upon which the decision might have taken place, and which might have satisfied the other members of the Court of the correctness of the result to which the opinion came, stands still wider of any necessary inference, that the final decision could have turned upon the hypothesis, that the hypothecation of moveables, not in existence, can, when they come into existence, and before any delivery of possession by the hypotheca-tor, be protected from attachment by his creditors.    The plaintiffs owned the brick yard, *quo ad hoc;* and the material of which the bricks had been, and were to be made ; they made and were to make all the advances for carrying on the business ; and were to make the sales, and to retain the proceeds until paid for their advances, and for the use of the yard, under the denomination of rent, and were to pay Evans (the debtor) one half of the nett profits, if any there were, as and for compensation for his personal services in carrying on the business of making the bricks.    Before the attachment he had settled with the plaintiffs, when it was found that nothing was due to him, and retired from the business ; leaving the plaintiffs in the entire possession of the yard and bricks ; and under a contract with them merely to haul the bricks to market at a stipulated price.    After all this, what ground was there left for a decision, that an hypothecatory right existed in the plaintiffs, available without actual possession, against attaching creditors ?

But, however this may be, we think, that the opinion of the court, as delivered in the case of *Bonsey* v. *Amee,* 8 Pick. 236, so far as it concerns the mortgages in question, fully supports the conclusion to which we have arrived in this case. In that case there was the pledge of the *hull of a vessel, then building as security for the payment of advances made, or to be made.*    Mr. C. J. Parker, in delivering the opinion of

the Court, says, "The instrument does not amount to a mortgage; for it does not appear, that there was any delivery of the vessel; and a delivery is necessary to constitute a mortgage of a chattel. Besides, the vessel not being in existence, as such, the instrument created only an executory contract; not a sale conditional or absolute." We cannot doubt that these remarks are in strict conformity to the principles of the common law.

It is certainly important that additional facilities should not be afforded to the perpetration even of what may be denominated constructive frauds. If by furnishing funds to an individual, which may always be done secretly; and, if in money, will seldom be attended with notoriety, he can be set forward upon a great scale of manufacturing, or the construction of articles attended with extensive expenditure, and thereby become ostensibly possessed of great resources, and of credit without limit; and, upon the threatening of any danger to his credit, if a secret mortgage or hypothecation, made early in the commencement of the business, of whatever shall grow out of the whole outlay, shall be allowed suddenly to spring up, and sweep the whole, it will operate as a fraud upon, perhaps, hundreds of others, who may have been induced by appearances, occasioned by the very impulse, growing out of such secret loans, to expend their time, labor and resources in the adventure, and expose them to an utter loss of the same. It is from a dread of such consequences, it may well be believed, that the civil law principle of hypothecating chattels, so as to be effectual against creditors, without the actual delivery of the same, has been repudiated, not only in countries where the common law has force, but in countries where the civil law has been more generally adopted. We are, therefore, brought to the conclusion, that the verdict in this case was well returned, and that judgment must be entered accordingly.